IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RONNIE RICHARDSON PARKER,    )
                                 )
       Plaintiff,             )
                                 )
v.                               )       CASE NO.  2:12-cv-0650-MEF
                               )         (WO – Do not Publish)
CHILTON COUNTY BOARD OF    )
EDUCATION,                  )
                               )
       Defendant.          )

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Chilton County Board of Education's ("the School Board") Motion for Summary Judgment (Doc. #42).  This case arises out of an employment discrimination lawsuit brought by Plaintiff Ronnie Parker ("Parker") against the School Board for alleged racial discrimination based on the School Board's failure to hire Parker for an interim head coach and head coach position for the Jemison High School football team. Parker asserts claims against the School Board for race discrimination and retaliation under Title VII (Counts I and II, respectively) and race discrimination and retaliation under 42 U.S.C. § 1981 via 42 U.S.C. § 1983 (Counts III and IV, respectively).  For the reasons discussed below, the School Board's motion for summary judgment is due to be GRANTED as to all counts.

## I.  JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  Additionally,

1

the School Board has not argued that the Court does not have personal jurisdiction over it, and neither side has contested jurisdiction.  Venue is appropriate pursuant to 28 U.S.C. § 1391.

## II.  LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine dispute of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine [dispute] for trial."  *Id.* at 324 (internal quotations omitted).  To avoid summary judgment, the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A plaintiff must present evidence demonstrating that it can establish the basic elements of its claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## III. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion. The submissions of the parties, taken in the light most favorable to Parker, the non-moving party, establish the following material facts:

Parker began working for the School Board as an Agriscience teacher at Jemison High School ("Jemison") in 1997, where he is still employed. At the time Parker began working for Jemison, he had a bachelor's degree, as well as his teaching certificate, in agribusiness education from Alabama A&M University. During his time as an agriscience teacher at Jemison, Parker coached boys' basketball, fast-pitch softball, boys and girls' track, powerlifting, and football. From 1997 until 2007, Parker coached football as linebackers

coach, assistant offensive coordinator, and assistant defensive coordinator. Parker was defensive coordinator of the football team from 2007 until 2011 and at all times relevant to this litigation.

The employment actions Parker claims were racially motivated occurred during the 2010–2011 school year. During the 2010–2011 football season, Brad Abbott ("Abbott") was the head football coach, Parker was defensive coordinator, and Kelly Smitherman ("Smitherman") was offensive coordinator. Jeremy Carter ("Carter") was the defensive line coach, and Daryl Lowery ("Lowery"), Jason Easterling ("Easterling"), and John Clements ("Clements") were also assistant coaches. All of the coaches except Parker were white. Parker is black.

The Jemison High School football team made the playoffs in the 2010 season. In November of 2010, during Jemison's first playoff game, Jemison scored to take the lead in the fourth quarter. Another coach instructed Parker to tell Jemison's kicker not to kick the ball to a certain player on the opposing team on the ensuing kickoff. When Parker relayed the instructions to Jemison's kicker, Smitherman, the special teams coach, intervened to tell Parker that Smitherman would talk to the kicker. In doing so, Smitherman placed his hand on Parker, and Parker subsequently became angry and told Smitherman not to put his hands on him. Both coaches then engaged in a heated argument on the sideline that was so loud it could be heard from the bleachers, where parents were seated, and as far up as the coach's booth above the field. During halftime, Parker went into the coaches' office and moved chairs out of the way in preparation for a fight with Smitherman. Carter and Clements

convinced Parker to leave the office before Smitherman entered in order to avoid a fight, and the game ended without further incident.   Afterwards, Abbott sent an e-mail to all the coaches warning them that fights between coaches during games in view of the parents would not be tolerated and that, if such an incident occurred again, the coaches would be escorted off the field by the police.

The Jemison football team went on to lose their second playoff game in November 2010.   Shortly thereafter, head coach Abbott resigned.   Alan Thompson ("Thompson"), principal of Jemison High School, formed a committee to select an interim head coach in preparation for spring training.[1]   The committee consisted of Brad Jackson ("Jackson"), Glenn McGriff ("McGriff"), and Neal Clements.   Jackson and McGriff were both members of the Jemison Quarterback Club, a group of boosters who raised money and volunteered time to the Jemison football team.   Neal Clements was a retired principal with longstanding ties to the community.   Thompson and all three members of the committee were white. Thompson contacted the committee members and told them to meet him at the high school shortly after Abbott resigned to discuss the selection of an interim head coach.   When the committee members met with Thompson, Thompson informed them that he had decided Carter would be the interim coach.   It was clear to the committee members that Thompson had already made the decision to hire Carter when the committee met, but that they did not disagree with his choice. McGriff assumed Thompson chose Carter because Carter was the

---

[1] Thompson died in a car accident during the course of this litigation.  There is no deposition or affidavit by Thompson in this case.

only candidate with head coaching experience.  (Docs. #44-5, 44-6, 44-7.)

On November 22, 2010, Thompson called a meeting of all the coaches to announce who would serve as interim head coach and athletic director.  Thompson announced that Carter would serve as interim head coach because, among other things, he had previous head coaching experience.  (Docs. #44-3, at 15–16; 44-4, at 19.)  Parker objected to Thompson's use of a committee to select the interim head coach and to the fact that the committee consisted mostly of members of the Quarterback Club, which he felt should not have a role in choosing a head football coach.  Parker also argued that Carter had been a coach at Jemison for only four months and that his head coaching experience was from a private school and was not comparable to coaching a public school football program.  Parker also stated that Thompson had not observed Parker in the classroom or the weight room and did not give him an interview.

It was at this point in the meeting that Parker stated that Thompson did not appoint Parker interim head coach because of Parker's skin color.[2]  Thompson replied that Parker's defense gave up too many points.  In his deposition, Parker stated that he felt this comment was motivated by racial animus because Thompson criticized Parker's defensive coaching, but did not criticize Smitherman's offensive coaching.  Parker also claims in his deposition that his defense allowed on average thirteen points a game, including the 2010 season.  (Doc.

---

[2] Both Smitherman and Carter stated that Parker did not tell Thompson at the November 22 meeting that Thompson failed to name Parker interim head coach due to Parker's race.  (Docs. #44-3, at 17; 44-4, at 20.)  However, since the Court must construe the facts in the light most favorable to Parker, the non-movant, the Court credits Parker's account when he states he claimed he did not get the interim position due to racial discrimination at the November 22 meeting.

#44-1, at 28.)  Statistics for Jemison's 2010 season, however, show that Jemison's defense allowed an average of 31.6 points per game.[3]  During Parker's tenure as defensive coordinator, his points against averages are as follows: 22.5 (2007), 21.8 (2008), 24.8 (2009), 31.6 (2010).  At no point did Parker's defense average 13 points a game as he stated in his deposition.  (Doc. #44-1, at 28.)

Parker and Thompson continued to argue at the meeting about the decision to name Carter as interim coach and began shouting at each other.  Parker then began to ask each coach in the room whether Parker deserved to be interim head coach.  Most coaches remained silent when asked.  When Parker asked Lowery whether Parker deserved to be interim coach, Lowery got up and left the meeting.  Parker then asked Smitherman, with whom he had had the sideline altercation, and Smitherman replied that Parker did not deserve to be head coach.  In addition to the sideline confrontation, Smitherman disliked Parker because he believed that Parker did not review film regularly and caused confusion among the players by changing the defense too close before games.  Smitherman also stated during the meeting that, if Parker got the interim head coach position, Smitherman would quit

---

[3] Jemison Football Team History, Alabama High School Football Historical Society, http://www.ahsfhs.org/teams2/gamesbyyear.asp?Team=Jemison&Year=200 (last visited Dec. 5, 2013).  The Court takes judicial notice of the statistics compiled on this website because the high school football scores contained on it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  The sources of information in this case are local newspapers.  *See Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1114 (9th Cir. 2012) (taking judicial notice of NFL website to determine number of games player played in California); *Ross v. O'Neal*, No. 11-cv-06124, 2011 WL 5041967, at *1 (C.D. Cal. Oct. 17, 2011) (taking judicial notice of Shaquille O'Neal's basketball playing statistics from NBA website).

coaching.  Eventually, Thompson stated that his decision was final and left the room.  As Thompson left, Parker stated that it was disrespectful for the principal to leave the meeting.

Carter became interim head coach and athletic director and proceeded to coach the team through spring training.  Carter received no extra pay for the interim head coach position.  Since the position resulted in no pay increase, Carter was appointed without any action by the School Board.[4]  (Doc. #44-2, at 16.)  In January 2011, Dave Hayden ("Hayden") became Superintendent of Chilton County Schools.  When Carter was hired for the 2010–2011 school year, he did not have a teaching certificate.  He was allowed to teach under a program that provided an alternative means to pursuing a teaching certificate.  After Carter failed to pass the required exam to acquire a teaching certificate, Hayden terminated his employment in March 2011 due to Carter's lack of a required certificate.  Hayden stated that his role in making hiring decisions was limited to ensuring that the candidate had a teaching certificate.  To be a coach, an employee must first be hired as a teacher, which requires a teaching certificate.  Aside from verifying that a candidate possessed a teaching certificate, Hayden stated that he followed whatever recommendation Thompson made.

In January 2011, Parker met with Hayden to express his interest in the permanent head coach position for the 2011–2012 school year.  Hayden stated Parker inquired about the application process, and Hayden told him to send an application to Thompson.  Parker took the opportunity to clarify what had happened in the sideline altercation with Smitherman the

---

[4] A decision to add or remove a coaching supplement would require a vote from the school board since this would involve an increase or decrease to the teacher's salary.

previous year.  Parker did not complain to Hayden about not getting the interim coach position and made no allegations of racial discrimination at this meeting.  Hayden described the meeting as "positive" and stated Thompson was "up beat."  (Doc. #44-2, at 14–16.)

Sometime in November or December 2010, Parker discovered he was no longer receiving e-mails that were being distributed to the other teachers.  Parker confronted Thompson about it, and after Parker showed Thompson that Parker's e-mail address was not on the distribution list, Parker began receiving e-mails again.  Hayden stated it was his understanding that whoever entered Parker's e-mail address on the list entered it as "Rparker" instead of "Rrparker," and that this was why Parker did not receive e-mails.  Parker claims that Thompson intentionally removed him from the e-mail list in retaliation for Parker's earlier statement that he was not given the interim head coach position because of his race.

On January 11, 2011, Parker found that he could not log into the computer network that would allow him to upload his professional development materials to maintain his teacher certification.  Thompson asked Parker why he had not uploaded his professional development materials, and Parker informed him he could not log onto the system.  Parker then e-mailed the Alabama State Department of Education for technical assistance, and an employee responded in a matter of minutes and recommended Parker use the "recover password" option to reset his password.  Parker followed these instructions, re-set his password, and successfully uploaded his professional development materials.  Parker claims that Thompson intentionally reset his password to retaliate against Parker.  However, an

affidavit of the School Board's District Technology Coordinator states that Thompson did not have access to or the ability to change Parker's password, and that no employee of the School Board with the ability to do so changed Parker's password.  (Doc. #44-8.)

On March 28, 2011, at Parker's request, Hayden met with Parker and Thompson to discuss Parker's concerns that he was being discriminated and retaliated against.  Parker brought to the meeting an agenda of topics to discuss, which included his claims that Thompson had intentionally deleted his name from the e-mail distribution list and changed his network password.  Parker also discussed his qualifications for the head coaching position and expressed his interest in being hired for it.  Parker stated that not all of the coaches had showed up to spring practices.  During the November 22, 2010 meeting, Thompson had stated that no coach would be considered for the head coach position unless he showed up for all spring practices.  At the March 2011 meeting, Thompson stated he did not intentionally leave Parker off of the e-mail distribution list.  He also mentioned the conflict between Smitherman and Parker and stated that each coach thought the other was doing a poor job.  Hayden listened to both parties and then concluded the meeting, stating that it was not yet time to address the head coach position as it had not yet been posted and interviews had not been conducted.

In June 2011, Thompson began conducting interviews for the head coach position. Once again, Thompson was responsible for the hiring decision, and Hayden's role was limited to ensuring the candidate had a teaching certificate and other necessary credentials.

Thompson interviewed six applicants and assigned them a rank.[5] Thompson's interview sheets reveal the candidates were ranked by number of years of head coaching experience. Joe Nettles was ranked number one and had thirty-eight years of head coaching experience. Joe Nettles was offered the head coach position but turned it down in favor of another coaching job at a different school. Merritt Bowden ("Bowden") was ranked second, and the interview form indicated he had seven years of head coaching experience and five years of coaching at the college level. After Nettles declined the head coach position, Bowden was offered and accepted the position. Darryl Burns was ranked third, and the interview form indicated he had four years of head coaching experience. Parker was ranked fourth, and the interview formed indicated he had no head coaching experience and fourteen years of assistant coaching experience. Smitherman was ranked fifth, and his form also stated he had no head coaching experience and twelve years of experience as an assistant coach. Lowery was ranked sixth and had over twenty years of assistant coach experience, but had no experience as a coordinator, as did Smitherman and Parker. Other than Parker, all of the coaches who were interviewed were white.

---

[5] The following facts are based largely on interview sheets filled out by Thompson. Hayden verified that Thompson adapted a standard teacher interview form to the interviews for head coach position. (Doc. #44-2, at 10.) The written notes by Thompson on the interview form are relevant. Moreover, they are not hearsay because they provide evidence of the basis for Thompson's employment decision, i.e. his state of mind, and are not offered for the truth of the matter asserted. *See Jenks v. Naples Cmty. Hosp.*, 829 F. Supp. 2d 1235, 1248–49 (M.D. Fla. 2011) (admitting as non-hearsay statements made by supervisor as recounted in plaintiff's diary that were relevant to supervisor's state of mind). Alternatively, the interview forms constitute business records of the School Board and are admissible under Fed. R. Evid. 803(6). *See E.E.O.C. v. West Customer Mgmt. Grp., LLC*, 899 F. Supp. 2d 1241, 1250 (N.D. Fla. 2012) (admitting interviewer notes regarding candidates who were hired or rejected as admissible business records).

After Bowden was hired in June 2011, Parker refused a position as defensive coordinator for the upcoming season.  Parker believed that he was more qualified than Bowden and that he did not get the head coach position because of his race.  Parker believed he was more qualified because of his long history with Jemison, the number of winning seasons he had, and his involvement with the community.  On December 7, 2011, Parker filed an EEOC charge alleging race discrimination based on the hiring of Carter for the interim coach position and Bowden for the head coach position.  He also alleged retaliation based on Thompson not speaking with him, leaving him off the e-mail list, and changing his password.

## IV. DISCUSSION

Parker asserts race discrimination claims against the School Board under Title VII (Count I) and § 1981 via § 1983 (Count III)[6] based on the School Board's failure to promote him to interim head coach in November 2010 and head coach in June 2011.  (Doc. #28.) Parker further asserts retaliation claims based on actions allegedly resulting from his opposition to Thompson's decision to hire Carter as interim head coach under Title VII (Count II) and § 1981 (Count IV).  (Doc. #28.)  Parker also asserted claims for hostile work environment under Title VII (Count I) and § 1981 (Count III).  However, Parker voluntarily

---

[6] Section 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981. *See Bryant v. Jones*, 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009). Therefore, Parker's § 1981 and § 1983 claims merge. *See Vason v. City of Montgomery*, 240 F.3d, 905, 906 (11th Cir. 2001).  For ease of reference, the Court will refer to these claims as § 1981 claims since the substantive rights of that statute apply but with the lack of respondeat superior liability pursuant to § 1983. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).

abandoned all hostile work environment claims in his response brief.  (Doc. #48, at 31.) Accordingly, summary judgment is GRANTED in favor of the School Board on Parker's hostile work environment claims.

## A.     Disparate Treatment

Parker's claims for disparate treatment are based on the School Board's failure to promote him to interim head coach in November 2010 and head coach in June 2011.  Parker has presented no direct evidence of discrimination, and the parties agree that the *McDonnell Douglas* framework for circumstantial evidence of discrimination applies to this case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To establish a prima facie case of racial discrimination under the *McDonnell Douglas* framework in the context of a failure to promote, a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for and applied for a position that the employer was seeking to fill; (3) despite qualifications, he was rejected; and (4) the position was filled with an individual outside the protected class.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005).  The same analysis applies to claims of race discrimination under § 1981 based on a failure to promote.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Once the employee has established a prima facie case of disparate treatment, the burden of production, but not of persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Vessels*, 408 F.3d at 770–71. This burden involves no credibility determination and is "exceedingly light," but it does require the employer to articulate a "clear and reasonably specific" non-discriminatory basis

13

for its decision. *Id*. at 770 (quoting *Tex. Dep. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)).

After the employer meets its burden to produce a non-discriminatory reason for its actions, the presumption of discrimination is eliminated. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000). The burden then shifts to the employee to prove the employer's proffered reason was a pretext for discrimination. *Id*. "To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination." *Vessels*, 408 F.3d at 771 (citation omitted). A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). In the context of a promotion, an employee cannot prove pretext by simply arguing or showing that he was better qualified than the person who received the position; he must show not merely that the employer's decision was mistaken but that it was in fact motivated by race. *Springer v. Convergys Customer Mgmt. Grp, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007). This means that an employee must show that the disparities between the successful applicant's and his own qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* at 1349 (citation omitted).

### 1.   The Interim Head Coach Position

Parker first argues that he was denied promotion to the interim head coach position

due to his race.  The School Board does not argue that Parker failed to establish a prima facie case of racial discrimination with respect to the interim coach position, and the Court finds sufficient evidence to support Parker's prima facie case.  Parker belongs to a protected class due to his race.  Parker was also qualified for and applied for the interim head coach position.  An employee is qualified for a position for purposes of Title VII if he satisfies the employer's objective qualifications.  *Vessels*, 408 F.3d at 769.  Parker possessed a teaching certificate and had approximately thirteen years of football coaching experience in November 2010.  He also had been a defensive coordinator since 2007.  Although there was no formal application process for the interim head coach position, an employee can satisfy the second prong of the *McDonnell Douglas* analysis if he can show that the employer used an informal and subjective hiring process and that the employer had reason to consider him for the position.  *See Jones v. Firestone Tire & Rubber Co.*, 977 F.2d 527, 533 (11th Cir. 1992).  Thompson used an informal and subjective hiring process by failing to solicit applications or to conduct interviews, and he had reason to consider Parker for the position because Thompson had to choose an interim head coach from the remaining 2010 coaching staff after Abbott's resignation.  It is also undisputed that Parker was rejected for the interim head coach position and that it was filled by a white employee.  Thus, Parker has made a prima facie case of discrimination for his failure to receive the interim head coach position.

The burden shifts to the School Board to articulate a legitimate non-discriminatory reason for Thompson's choice of Carter rather than Parker.  Thompson's reason for appointing Carter to interim head coach was that he was the only member of the coaching

staff that had head coaching experience.  He also stated Parker's defense gave up too many points.  These are "clear and reasonably specific" non-discriminatory reasons why Carter, rather than Parker, was chosen for the interim head coach position and are sufficient to meet the School Board's "exceedingly light" burden of production.  *See Vessels*, 408 F.3d at 770.

Now Parker must produce evidence sufficient to permit a reasonable fact-finder to conclude that the School Board's reasons for appointing Carter were pretext for discrimination.  Parker's grounds for pretext are that Thompson used a largely advisory committee, Carter had been on the coaching staff for only four months at the time of the promotion, Carter's head coaching experience had been at a private school, and Parker's subjective feeling that Thompson's claim that Parker's defense gave up too many points was racially motivated.  These allegedly pretextual reasons fall far short of the evidence required to permit a reasonable fact-finder to conclude that these reasons were not the basis for the hiring decision and that discrimination was the real reason.  *See Vessels*, 408 F.3d at 771; *Hicks*, 509 U.S. at 515.  The amount of head coaching experience a candidate has is a legitimate, non-discriminatory reason for hiring that candidate as a head coach, and the extent to which head coaching experience from a private school translates to success at a public school is within the business judgment of the employer and does not suggest pretext.  Nor is the fact that Carter was a coach at Jemison for only four months grounds for pretext.  *See Cofield v. Gold Kist, Inc.*, 267 F.3d 1264, 1269 (11th Cir. 2001) (refusing to second guess employer's decision to emphasize qualifications over length of service).

Further, the disparities between Carter and Parker are not so great as to allow a

16

reasonable fact finder to conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Carter over Parker. Carter was the only candidate with head coaching experience. He also possessed the minimum qualifications required by the School Board, which was that he hold a teaching certificate or pursue a teaching certificate. When Carter failed to obtain his teaching certificate at the end of the 2010–2011 school year, he was terminated by the School Board. The evidence shows Carter was held to the same standard as other candidates, and that head coaching experience, rather than race, was the determining factor in his selection. Parker essentially invites the Court to second guess Thompson's judgments about whether Carter or Parker would make a better football coach. But the law is well-settled that a "plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quotation and citation omitted). Since Parker is unable to raise a triable issue of pretext, summary judgment is GRANTED in favor of the School Board on Parker's disparate treatment claim based on his failure to get the interim head coaching position.

### 2.   The Head Coach Position

Parker next argues he was denied promotion to the head coach position in June 2011

due to his race.[7]  It is undisputed that Parker has made a prima facie case of discrimination for the head coach position for largely the same reasons as for the interim head coach position.  The head coach job went to Bowden, who is white, and Parker indisputably applied for and was qualified for the position.  The issue is thus whether Parker can produce sufficient evidence of pretext to overcome summary judgment.

Thompson's, and thus the School Board's, reason for hiring Bowden was once again based on years of head coaching experience.  The evidence shows that Thompson ranked the six head coach candidates in descending order based on years of head coaching experience and offensive or defensive coordinator experience.  Parker was ranked fourth out of the six candidates.  The first offer went to Joe Nettles, who was ranked first on Thompson's interview sheets, but he declined and accepted a position at another school.  The second offer went to Bowden, who was ranked second on Thompson's interview sheets, and Bowden accepted the position.  The interview sheet indicated that Bowden had seven years of head coaching experience and five years of coaching at the college level.  Based on this evidence, the School Board has met its burden of production by articulating head coaching experience as a non-discriminatory basis for hiring Bowden, rather than Parker, as head coach.

Once again, Parker fails to present evidence of pretext sufficient to permit a rational

---

[7] Parker also appears to assert a disparate treatment claim based on his no longer coaching football in any capacity beginning with the 2011 season. (Doc. #48, at 2.)  However, Parker stated in his deposition that he voluntarily declined a position as an assistant coach after Bowden became head coach. (Doc. #44-1, at 24.)  Therefore, insofar as Parker makes a disparate treatment claim based on his lack of a coaching position beginning with the 2011 season, summary judgment is GRANTED in favor of the School Board on this claim.

fact-finder to conclude that the School Board's reasons for hiring Bowden were pretext for discrimination.  Parker's reasons for pretext are that Thompson used a largely advisory committee to make the selection, that Parker was more qualified due to his long history with Jemison, and that Parker had a large number of winning seasons and extensive involvement with the community.  These reasons are another attempt to substitute Parker's business judgment for that of the School Board, which the Court will not permit.  *See Chapman*, 229 F.3d at 1030.  It is undisputed that Bowden was highly qualified for the position of head coach.  Ranking candidates by years of head coaching experience is a non-discriminatory method of hiring since this experience is directly relevant to the same job, i.e. head coach. *See Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (holding that superior qualifications and experience were legitimate, non-discriminatory reasons and that plaintiff accordingly could not create triable issue of pretext).  Further, the evidence shows the ranking method did not involve pretext because Thompson made job offers in the order by which candidates were ranked.  In short, there is no evidence that would allow a reasonable fact-finder to conclude that the School Board hired Bowden on any other basis than its stated non-discriminatory reason, namely, head coaching experience. Therefore, summary judgment is GRANTED in favor of the School Board on Parker's disparate treatment claim on the basis of his failure to get the head coaching position.

## B.    Retaliation

Parker claims he was retaliated against after stating he did not receive the interim head coach position due to his race at the November 22, 2010 meeting with Thompson and the

other coaches.  To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity.  *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998).[8]  In the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 (2006)).  The Supreme Court recently held that causation for Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)," which requires only that the protected characteristic is "a motivating factor" behind the adverse employment action.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).  That is, the employee's engaging in statutorily protected activity must be the but for cause of the employer's adverse employment action.[9]  If the employee establishes a prima facie case of retaliation, then the burden shifts to the employer to produce legitimate reasons

---

[8] The analysis for a Title VII and § 1981 retaliation claim are the same.  *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

[9] Given the *Nassar* Court's reasoning that, "absent an indication to the contrary in the statute itself," but for causation is "the default rule[]" that Congress is presumed to have incorporated into a statute creating an intentional tort, the Court applies the but for causation requirement to Parker's retaliation claim under § 1981.  133 S. Ct. at 2524–25.  This also accords with well-established precedent analyzing Title VII and § 1981 claims identically.  *See, e.g.*, *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 n. 6 (11th Cir. 2010); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985); *see also Shumate v. Selma City Bd. of Educ.*, No. 11–00078, 2013 WL 5758699 at 2–3 (S.D. Ala. Oct. 24, 2013) (applying *Nassar*'s but for causation standard to § 1981 claim).

for the adverse employment action.  *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2001).  If the employer does so, the employee must then show that the reasons given by the employer were pretextual.  *Id.*

Parker alleges the retaliation was the result of his statement on November 22, 2010, to Thompson that Thompson did not appoint him interim head coach due to Parker's race. The retaliatory acts of which Parker complains are that he was removed from an e-mail distribution list sometime in November or December of 2010, that Thompson changed Parker's network password, and that Thompson would not speak with him.  Parker's claim that Thompson denied him a coaching position due to his race constitutes statutorily protected opposition to an unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a).  The Court has considerable doubt about whether the alleged acts of retaliation were adverse employment actions or whether Parker's statutorily protected activity was the but for cause of those actions.  However, even assuming Parker can establish a prima facie case of retaliation, the School Board has articulated non-retaliatory reasons for the actions in question, and Parker has presented no evidence that those reasons were a pretext for discrimination.

The undisputed evidence shows that, after Parker established he was not receiving e-mails, he was added to the e-mail distribution list and began receiving e-mails.  The undisputed evidence further shows that this omission was the result of Parker's e-mail address being listed as "Rparker" instead of "Rrparker,"  which is nothing more than a clerical error as opposed to a retaliatory act.  With respect to Parker's network password, the

undisputed evidence establishes that Thompson had no ability to change Parker's password and that Parker resolved the problem within minutes after e-mailing the Alabama State Board of Education and resetting his password.  Finally, Thompson's failure to speak with Parker is not substantial enough to constitute an adverse employment action.  Although Thompson may have avoided contact with Parker, Thompson met with Superintendent Hayden at Parker's request to discuss Parker's grievances.  Thompson's failure to speak with Parker on a regular basis is not an action that would dissuade a reasonable worker from making or supporting a charge of discrimination, and is thus not sufficiently adverse.  *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (stating that the requirement that a retaliatory act have a "demonstrable adverse impact" is "consistent with the basic principle that Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace.") (quotation and citation omitted).  Since every potential act of retaliation given by Parker is either a legitimate, non-retaliatory act or does not rise above the level of an "ordinary tribulation of the workplace," the School Board is entitled to summary judgment on Parker's retaliation claims.

### V. Conclusion

Based on the foregoing, it is hereby ORDERED as follows:

1.	Defendant's Motion for Summary Judgment (Doc. #42) is GRANTED as to all of Plaintiff's claims, and Plaintiff's Second Amended Complaint is DISMISSED WITH PREJUDICE.

2.	The pretrial hearing and trial of this case are CANCELLED.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this the 13th day of January, 2014.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE